DUKE OF YORK Next case is Nozomi v. Nokia et al., 2013, 1165. Mr. Fellinger? Yes, Your Honor. May it please the Court. I believe that this appeal involves a simple error that was rooted in two flaws in the District Court's opinion. The first was a misapprehension of the disclosed invention, and the second was a misapplication of this Court's case law. We believe that the principal error in evaluation of the disclosed invention is articulated at pages A7 and A8 of the Court's opinion, where the Court states that the patent in suit describes an invention primarily for a single purpose, processing Java byte codes, rather than operating in multiple modes or customization by end users. That finding is directly contrary to the specification of the asserted patents. I point the Court to appendix page A97, which is the 362 patent, column 3, lines 8 to 9, and 46 to 52. Didn't the Court construe capabilities to mean configured to, and is that correct? Yes, Your Honor. We believe that is correct as far as it goes in that the hardware within the CPU is configured to perform each of the functions claimed. Where the Court erred, Your Honor, is in looking to unclaimed software. The Court acknowledged the claims were directed to hardware, and based on the declaration of our expert, which is not contested on appeal, all of the elements of the claimed hardware are indisputably present. The bulk of the Court's analysis, however, focuses on what's referred to as the JTEC software. But it can't function without the JTEC software. It isn't capable without the JTEC software, is it? It is, Your Honor. How? The hardware is capable, but it can't perform the described function. The hardware is present, and the described function is a dual-mode processor, which operates in one of two modes. But it needs the JTEC software to do that, right? No, Your Honor. No? Essentially what the Q systems do is they operate in what the patent describes as a bypass mode, where they are bypassing what's called the Giselle hardware accelerator to execute register-based instruction. I thought you pretty clearly agreed in your brief that you couldn't perform the function without the JTEC software. Am I wrong about that? The hardware is present, and without modification, the hardware can perform that. But the hardware alone can't do it. It requires software to do it, right? The hardware is not activated without the presence of the software. We don't dispute that, Your Honor. But you're not saying that the CPU is capable without the software? We are, Your Honor. We believe the hardware within the CPU is capable of performing the same function without the software. If somebody provides a hack? We're not relying on a hack or a modification, Your Honor. We're relying on the inherent capabilities of the hardware that is present. The ARM 926 EJS CPU core, which is present in the Q's products as well as other products, has that inherent capability. So you are arguing an incorrect claim construction? Yes, in that sense, Your Honor. You're saying configured to is different from capable of? In that sense, Your Honor, yes. So long as the court construed the claim as directed to hardware. And the way we had advocated configured to is that the transistors and the wires are situated such that if activated, they would perform the claimed function. Does addition of the software modify the CPU? No. And that's in Dr. Babb's declaration. He indicated there was no modification of the hardware required in order to perform the claimed functions. The CPU, the software, excuse me, would either activate or not activate that function. And as such, Your Honor, we believe this case is analogous to both the FinGen case, which talked about software which was locked but present in the device as shipped, as well as the Silicon Graphics case, which was directed, again, to hardware components that, while not functional without an operating system, the operating system was not required in order for the hardware to infringe. And so we believe that... But here the software is part of the claim, isn't it, in the sense of defining what capability means? We don't believe so. I mean, you say at page 40 and 41 of your book, you say that Giselle circuitry cannot be used without the JTEC software, correct? Thank you. Yes, Your Honor. That goes to the use, not the inherent function. So just as in Silicon Graphics, where the accused graphics processor could not be used without an operating system... I mean, it can't be used without the software, but it's still capable? Yes, Your Honor. I think that's the crux of the argument, that the software is not an element of any claim, and it is true that the processor, the CPU by itself, doesn't perform any function. It must have software running in order for it to perform a function. But the capability of that CPU and the hardware within that CPU does not need to be modified in any way for the hardware to have those inherent properties. So this sounds like you're reading out the functionality requirement in the claim. Not in the following sense, Your Honor. The circuits could be arranged in such a way that they didn't have... We did not claim a generic CPU that would need to be programmed in order to have this function, programmed by software. Rather, we claimed a configuration of hardware circuits, which would have this function. Is that analogous to an automobile that is capable of running, but doesn't run until you put the key in? I think it would be more analogous if you had an automobile that was capable of running in one of two modes. Say a hybrid that could run in either an electric mode or a gas mode, and you had to turn a key to choose one or the other. So long as the automobile had both properties inherently in it, the fact that, as appellants have argued, they only operate in one mode, that wouldn't eliminate the presence of the other mode from the automobile. Well, but it's not like the key situation, which was Intel. I mean, the software is not there. It's not that you have to activate the software that's within the system. It's not there. You have to bring it in, right? It's true that the software is not there, Your Honor, but you know the claim component is the hardware, and the hardware is there. And so the Fingen case, there was software code that was present but locked, and absent the addition of an unlocked key, would not function. And that's, we believe, the equivalent circumstance to the Giselle hardware. Except that the software is not there. Just as the key was not there when the device was shipped, or just as an Intel, where the memory was not configured to operate in a page mode, but it still had that inherent capability. We believe that that's the analogy, Your Honor. If the claim was drawn to software, and there are other claims in the patent, we point to claim 86 in the brief, which claimed both the hardware and the software. But in this circumstance, Your Honor, the applicants chose to claim only the software components, which have this inherent property and capability. Without the software, how is that hardware different than a brick? That is, supposing they drilled a hole through it and used it for a key, I imagine it's pretty tiny. But, otherwise I'd say a doorstop. But they use it for a keychain holder. Is it infringing? I mean, it's there. I believe, so long as they provide a chip that's not activated, it still infringes so long as it has all the claim elements. This was, again, the Silicon Graphics case. There's a separate statutory provision for use and sale of a claimed apparatus, and we're arguing sale of a claimed apparatus. And there is a described advantage, Your Honor, which is described in the specification of being able to use the same CPU, both in systems that run legacy applications. Without the software, they can't do it. They can run legacy applications using the CPU, which is exactly what they do. Using the CPU? Yes, Your Honor. But that's what our claims are directed to, a CPU that executes two different instruction sets, register-based and stack-based. And without it, they absolutely execute register-based instruction.  Without adding software, which is not claimed, that's true. But the inherent properties of the CPU would allow for that if, just as the addition of download key would allow that in the FinGen case, the addition of software, which is not claimed, would allow that functionality without any modification of the CPU. Shall we hear from the other side, and we'll give you three minutes back? Thank you, Your Honor. Ms. Maynard, you were going to split your argument 12-3 with Mr. Anderson? Yes, Mr. Lurie, if I may. And it's at 12 now. All right. May it please the Court, Deanne Maynard for Swing Media, joined by Kevin Anderson, who represents Western Digital. This Court's case law is clear. When an apparatus claim claims functional limitations, that functionality must be made available to the end user for the product to infringe. And here, it's undisputed that the functionality… Well, that's not quite true, is it? I mean, in the sense that Intel says if it's there, even if it's not available to the end user unless it's unlocked, but we're going to say it's infringing even if it's not unlocked. Well, I think… So your statement's a little broad, isn't it? Well, made available to the user, I think, Judge Dyke. And so, yes, you're certainly right that if a product is sold where the end user can access the claimed functionality, for example, with an activation code or a key, then perhaps you would have infringement. But with software? Well, but here, Judge Lurie, it's undisputed that the end users of the Slingbox and Western Digital's MyBook cannot access, cannot add software to this. This is not a situation… Isn't the CPU capable of being used with the software? No, Your Honor. Not in the products as sold by our clients. And not even if you zero in only on the CPU. The CPU is dormant and disabled. And in response to your question to the other side, Judge Lurie, actually, yes, the CPU would have to be modified in order to practice the claimed functionality. So, as Judge Dyke was pointing out… How would it be modified other than by adding the software? As the testimony of the ARM30v6 witness shows, and that's at A3774 and after, the addition of the JTEC software interacts with the hardware. And so it changes gates in the hardware that modify storage in the hardware, the registers in the hardware. So it isn't a situation like Fantasy, Sports, Your Honor, or Fingen where the user is able to activate already extant properties. The hardware itself would have to be changed. And that is undisputed on this record. They have no response to the notion that the registers in the CPU itself would have to be changed in addition to adding the software. But more importantly, that's not the case they brought. They haven't sued the chipmaker here. They have sued the sellers of a Slingbox and Western Digital's MyBook product. And it's absolutely undisputed that no user can add the JTEC software to our products absent, you know, breaking them open, hacking them… But they waived that. They said they're not arguing any hacks. Right. It's undisputed that it can't be done. And so under this court's case law, even taking into account cases like Intel and Fingen and Fantasy, Sports, the users of our product can't access the claim functionality. These products cannot process. They are not capable of processing Java in the hardware. And that is a limitation of every single one of these claims. And that really should be the end of the story. I don't recall that you argued that the hardware wasn't sufficient. You seemed to be saying that a minute ago. Did I misunderstand? That we didn't argue the hardware what, Your Honor? I thought a minute ago you were arguing that the hardware itself wasn't sufficient. In other words, just adding the software doesn't make it capable. Adding the software would interact with the hardware to modify registers on the hardware. It's just adding the software. Basically, there's nothing in the hardware that's missing. The hardware would have to be modified in order to function. But that's the addition of the software. Well, it's both, Your Honor. It's not just like plugging in the software. The software would interact with the hardware and would change registers in the hardware. In other words, it would affect the way circuits flowed through the hardware. It would physically switch paths. It's true that we don't... Did you make that argument in your brief? I don't recall. Well, their argument... No, Your Honor. You did not make the argument in your brief. This is an argument in response to their reply brief. In their reply brief, they've come back and said a software-hardware distinction and that what we're arguing is that they're making a distinction between software and hardware. I don't think that's a distinction you can find in this Court's cases. I think the Court basically says for apparatus claims, hardware or software, if the functionality is not made available to the end user, there's no liability. But if they are making a distinction, if this Court's inclined to go with such a distinction, then in the record, yes, Your Honor, in our reply brief on summary judgment, which is in the JA, at A4930... So you made the argument in the district court, but you didn't make it in your brief here. This is an argument... Yes, Your Honor, this is an argument in response to their reply brief. I'm making it now. But I don't think you need to agree with me with respect to this point for us to be correct because I think it's sufficient that the functionality is completely unavailable to our end users, whether you focus on our product as a whole, or whether you focus on just the processor within the products as we sell them. The processor in the products that we sell is dormant and disabled and incapable of processing JAVA in the hardware, which is what each of the claims limitations requires. I believe there is one sentence in our opening brief, Judge Dyke, that suggests there will be changes to both, but I can't recall on what page it is or where to point to it. Looks like you're ready to yield to Mr. Anderson. I will, unless you have further questions for me. No. Thank you. Yes, Your Honor, there was discussion before about the changes that are required here, and as the chip comes up in the default configuration, those circuits are dead. They're dormant. They cannot be accessed. You can blast JAVA bytecodes at that chip as much as you want, and they cannot be processed, and that is absolutely undisputed. That's the testimony of the ARM30B6 witness that my co-counsel referenced it to. It is not, in that situation, a processor for processing stat-based instructions. Now, it can be. You can take it, and you can put it in a system, and you can alter it with the software, but the software is not like in FinGen or in Silicon Graphics, where it's just a means to give it an environment in which to operate. That software has to go in there and entirely reconfigure the registers, which are set by default in a certain way, but have to be set a different way, and no one knows how to do that. But you're saying the software does it by itself? The software reconfigures the registers that are part of the hardware to enable the hardware to start accessing. In other words, the CPU is capable with the addition of the software. When one adds, it's not merely the addition of the software, it's the interaction of the software to change things in the hardware, an argument which wasn't made in the brief. No, I think, Your Honor, that's our entire argument. The change in the hardware? I thought Ms. Maynard said that wasn't made in the brief. Well, it's absolutely the case that the changes that are discussed throughout the OSAC brief in terms of the software, that's what it's doing. It was made in the brief and it was just discussed at length in the citation. The argument was made, and I understand the argument, that this wouldn't have the capability without the software, but I don't recall the argument that the hardware standing alone was insufficient. It's absolutely there, Your Honor, because that's the entire thrust of the arm. Where? That's the entire thrust of the arm. Ms. Maynard said it wasn't there. You say it is. Where is it? If I can find the citation to the arm 30B6 witness that Ms. Maynard raised, that's where it was discussed because that's that whole specificity. I don't care whether it was discussed by the witness. I'm asking where it's discussed in the brief. I understand, Your Honor, and I can find that. If I can find that citation, I don't have it off the top of my head. You shouldn't be coming to oral arguments and making different arguments than those that appear in the brief. Your Honor, that's the argument. That is the basis of the citation to the arm 30B6 witness. I thought we had a clean issue here, that the hardware was sufficient but that it wouldn't be capable without the software. Now there seems to be an argument that the hardware isn't sufficient. No, Your Honor, just to address that, I don't think that there's any fact issue here. On our side, I don't think that we dispute that the silicon etchings exist that they point to. And on their side, I don't think they dispute that there's this elaborate procedure that is described by the arm 30B6 witness that has to change the values in the hardware to reconfigure it to be able to execute the Java byte codes. I don't think either side has a fact issue. There it is, I think, as Your Honor said, fairly clean. And I apologize, I'm through my time. Thank you, Mr. Anderson. Mr. Mellinger. Thank you, Your Honor. If I may just start by responding to the issue that was raised in the argument. I would say, at best, that would raise a fact dispute with the testimony of Dr. Babb or the declaration of Dr. Babb, and that's Appendix 6532 to 6533, where our expert indicated in his declaration that the products do not require physical modification to be capable of being put into operation. And in particular, based on my review of the ARM 96 EGS RTL, I found that the Giselle hardware is indeed integrated into the ARM 96 EGS processor. So there is evidence in the record directly contrary to the argument that was just presented. So at best, that would raise a fact dispute. As far as the implication of that in the context of the patent, I would again direct the Court to the description of Figure 2 of the 362 patent, Column 3, Lines 46 to 52, which explains that at startup in the preferred embodiment, there is a multiplexer where the hardware accelerator is bypassed by default. And so that's essentially the configuration that appellants have argued, that they bypass the hardware accelerator by default, and you need to add software in order to make use of the hardware accelerator. But the evidence on this appeal and the facts taken in the light most favorable to Nizomi show that the hardware itself has the capability that's claimed, and that the addition of software is not claimed, and that the use of the bypass of the hardware accelerator to execute legacy applications is an expressly contemplated benefit of the invention and distinguishes over prior processors that would only execute stack-based programs or only execute register-based programs. So unless Your Honors have further questions for me. Thank you, Mr. Belanger. We'll take the case under advisement. I appreciate it. Thank you, Your Honor.